UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

SAVAGE TAVERN, INC.,

       Plaintiff,

v.                                                    No. 5:21-CV-078-H

SIGNATURE STAG, LLC,

       Defendant.

**MEMORANDUM OPINION AND ORDER**
**GRANTING A PRELIMINARY INJUNCTION**

       This cautionary tale begins with a baseball hat at a Metallica concert. Signature Stag is an upscale menswear store in Lubbock that, since 2016, has sold shirts and other items featuring a logo composed of two revolvers, facing upwards and crossed at their barrels, with a lone red star on each handle. Savage Tavern is a bar that opened in 2018 not far from Texas Tech's campus in Lubbock; it uses the same logo on marketing materials and apparel. In 2020, Savage Tavern registered the logo as a trademark with the Patent & Trademark Office. It then brought this trademark-infringement suit against Signature Stag.

       The attentive eye sees why Savage Tavern's claim is doomed: Trademarks are owned not by the first person to register them, but by the first person to use them in commerce—here, Signature Stag. Knowing this, Signature Stag counterclaimed and now seeks a preliminary injunction to stop Savage Tavern from using the Mark.

       Signature Stag is almost certain to prevail on its counterclaims and faces irreparable harm absent immediate relief, so its motion for a preliminary injunction is granted. Savage Tavern must cease all use of the Mark until a final decision on the merits can be reached.

1.     **Factual and Procedural History**

Savage Tavern, Inc., is a bar in Lubbock, Texas.  Dkt. No. 10 at 1.  It registered itself

with the Texas Secretary of State in December 2016 and, according to its social media

pages, opened to the public in June 2018.  Dkt. Nos. 10 at 1–2; 11 at 29 (Facebook post of

opening).  In January 2020, Savage Tavern filed an application for a trademark with the

United States Patent and Trademark Office (PTO).  The proposed mark consisted of "two

crossed revolvers outlined in black with one red star on each handle."  Dkt. No. 1 at 12.

The application was granted, and the Mark was registered in September 2020 under serial

number 88-777,542 and registration number 6,140,413.[1]  *Id.*; Dkt. No. 14 at 4 (registration

certificate).  Savage Tavern uses the Mark as part of its logos, signs, and advertisements—

and on apparel it sells.  Dkt. No. 1 at 4.



*The Mark*
Dkt. No. 1 at 12

---

[1] To be precise, Savage Tavern was granted a service mark.  "Trademark" includes both trademarks
and service marks, the sole distinction being whether the seller offers goods or services.  Since
Savage Tavern is in the restaurant business, it is classified as providing a service, rather than goods.
The Court uses "trademark" because it is more familiar and equally accurate, albeit slightly less
precise.

Signature Stag, LLC, is a fine menswear and apparel business.  Dkt. No. 10 at 1.  Its owner, Natalie Huey, opened the brand's first location in Midland in 2013; the Lubbock location followed in August 2017.  Dkt. No. 11 at 3–4 (Affidavit of Natalie Huey).  "Signature Stag has been licensed by and has sponsored Texas Tech Athletics for the last several years."  *Id.* at 3.  In June 2016, Huey designed a crossed-guns graphic to be used on apparel for sale at her stores.  *Id.* at 3, 7–16.



*The Graphic*
Dkt. No. 11 at 8

Signature Stag sold its first product bearing the graphic on or before November 2016 and, since then, has continuously sold and advertised apparel with that graphic through various channels, including its sponsorship of Texas Tech Football and Athletics.  *Id.* at 4, 18–19 (receipts of crossed guns merchandise), 21 (declaration of Paul Fioroni attesting that he bought a shirt bearing the crossed-guns graphic in November 2016), 22–23 (images of Fioroni's shirt bearing the graphic).

Huey alleges that, in March 2019, she and her husband, BJ, were in Lubbock for a Metallica concert when she met Brandon Fuller, the owner of Savage Tavern.  *Id.* at 4; Dkt. No. 1 at 5.  In a box suite at the concert, Huey allegedly presented a variety of Signature

Stag products featuring the graphic to those assembled, including Fuller.  Dkt. No. 11 at 4.
That decision proved fateful.

Sometime after this meeting, Savage Tavern began to sell hats with the same graphic.
Huey alleges that she recently "saw a third party wearing a baseball hat with a crossed guns
design that [she] mistakenly believed was purchased at [her] store."  *Id.*  She recounts that
she "was corrected and learned from the third party that the hat was purchased at Savage
Tavern."  *Id.*; *see also id.* at 20 (alleged picture of a Savage Tavern baseball cap with the
mark).  She states she "was unaware prior to that time that Savage Tavern actually sold
apparel very similar to the apparel sold at [her] store."  *Id.* at 4.  And her account parallels
that of a Signature Stag customer, Paul Fioroni, who attests that he is familiar with the
crossed-guns graphic on Signature Stag apparel and that he observed the same graphic on a
Savage Tavern hat.  *Id.* at 21.

Savage Tavern, for its part, alleges that, in late 2020, the Hueys visited Savage
Tavern where Fuller began to talk to them.  Dkt. No. 1 at 5.  During this conversation,
Fuller allegedly noticed the crossed guns graphic emblazoned on BJ's baseball hat and
informed him that it was infringing upon Savage Tavern's mark.  *Id.*  BJ allegedly
commented to the effect of "Ya, we know—you should come by and buy some of our
merchandise."  *Id.*  Signature Stag rejects this retelling and denies that Natalie was present
during the encounter.  Dkt. No. 4 ¶ 10.



*The Hats*
Dkt. No. 11 at 20; Dkt. No. 1 at 25

Fast forward to January 2021.  Savage Tavern's counsel sent a demand letter—along with a copy of its trademark-registration certificate—to Huey alleging trademark infringement and asking her to destroy all materials bearing Savage Tavern's mark, among other things.  Dkt. No. 1 at 14–15.  Signature Stag never responded, so Savage Tavern filed this suit, invoking the Court's federal-question jurisdiction.  *Id.* at 6–7.  Signature Stag answered and filed a counterclaim.  Dkt. Nos. 4; 5.

Signature Stag's answer denies infringement and asserts that it was the first to use the crossed-guns graphic in commerce.  Dkt. No. 4 at 3–4.  It also raises defenses alleging: (1) that Savage Tavern fraudulently registered the trademark because it knew or should have known that Signature Stag's use of the crossed-guns graphic preceded Savage Tavern's use; (2) that Savage Tavern should be estopped from claiming a right to sell apparel with the mark because it only registered the mark in the "hotel, restaurant, and bar" industries; and (3) Savage Tavern comes to court with unclean hands because it knew or should have known that Signature Stag was the senior user.  *Id.* at 4.  Signature Stag asserts counterclaims for unfair competition and trade-dress infringement under the Lanham Act;

trade-dress infringement under Texas statutes and common law; cancellation of Savage Tavern's trademark registration on the basis of false and fraudulent registration; and business disparagement.  Dkt. No. 5 at 6–11.

Signature Stag followed its counterclaims with a motion for a preliminary injunction, asking the Court to enjoin Savage Tavern from using the Mark until a final decision on the merits can be reached.  Dkt. No. 9 at 4.  Despite filing other counterclaims, Signature Stag rested its motion solely on its counterclaim for trademark infringement under the Lanham Act.  Dkt. No. 10 at 5–7.  Signature Stag writes that it "holds conclusive evidence that it developed and began using the mark in commerce prior to Savage Tavern, Inc.'s existence" and asks the Court to resolve the motion without a hearing because it is "unquestionably the senior user of the mark."  *Id.* at 5–6.  A response and reply have been filed (Dkt. Nos. 12–14, 18), so the motion is ripe for review.  After briefing closed, the Court confirmed that the parties do not seek a hearing on the motion.  *See* Dkt. No. 20.

## 2.  Governing Law

### A.  The Preliminary Injunction Standard

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  There are two types of injunctions—prohibitory and mandatory.  "[T]he issuance of a prohibitory injunction freezes the status quo, and is intended 'to preserve the relative positions of the parties until a trial on the merits can be held.'  Preliminary injunctions commonly favor the status quo and seek to maintain things in their initial condition so far as possible until after a full hearing permits final relief to be fashioned."  *Wenner v. Tex. Lottery Comm'n*, 123 F.3d 321, 326 (5th Cir. 1997) (citation omitted; quoting

*Camenisch*, 451 U.S. at 395).  A mandatory injunction, on the other hand, "seeks to alter the status quo prior to litigation rather than maintain it.  That is, it mandates that defendants take some action inconsistent with the status quo rather than prohibiting them from altering the status quo."  *Texas v. Ysleta del Sur Pueblo*, EP-17-CV-179-PRM, 2018 WL 1566866, at *9 (W.D. Tex. Mar. 29, 2018).

"A stronger showing by plaintiff is required for a mandatory preliminary injunction that requires [a] defendant to take actions that cannot be undone or steps to alter the status quo."  J. Thomas McCarthy, McCarthy on Trademarks § 30:50 (5th ed. 2018) (hereinafter McCarthy).  The facts and law must *clearly* favor the moving party for such an injunction to be warranted.  *Justin Indus., Inc. v. Choctaw Secs., L.P.*, 920 F.2d 262, 268 n.7 (5th Cir. 1990); *accord Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976).

In a trademark case, however, the status quo to be preserved is the situation prior to the time the alleged infringer began using the mark, for that is the last peaceable, non-contested status of the case.  McCarthy § 30:50.  Thus, "[a] preliminary injunction that orders [the] defendant to cease its use of the infringing mark is one that maintains the status quo prior to defendant's use and is not a mandatory injunction."  *Id.*; *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878–79 (9th Cir. 2009) (same). Accordingly, the preliminary injunction Signature Stag seeks is prohibitory, not mandatory, despite the fact that it would compel Savage Tavern to undertake, rather than cease, certain actions.  *See id.*

Federal Rule of Civil Procedure 65(a) governs the issuance of all preliminary injunctions regardless of whether they are prohibitory or mandatory.  For a court to issue a preliminary injunction, the moving party must establish by a preponderance of the evidence

that: "(1) it is substantially likely to succeed on the merits of its claim; (2) it will suffer irreparable injury in the absence of injunctive relief; (3) the balance of the equities tips in its favor; *and* (4) the public interest is served by the injunction." *Sahara Health Care, Inc. v. Azar*, 975 F.3d 523, 528 (5th Cir. 2020) (emphasis added). Because "[a] preliminary injunction is an 'extraordinary remedy,'" *Texans for Free Enterprise v. Texas Ethics Commission*, 732 F.3d 535, 536 (5th Cir. 2013), a preliminary injunction "should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements." *Bluefield Water Ass'n, Inc. v. City of Starkville*, 577 F.3d 250, 253 (5th Cir. 2009).

An evidentiary hearing on a motion for a preliminary injunction is not "required in the absence of a material disputed fact." *Parker v. Ryan*, 959 F.2d 579, 584 (5th Cir. 1992). Here, the Court perceived no evidentiary disputes, and neither side took the Court up on its offer to hold a hearing, so none was held. *See* Dkt. No. 19 (asking if either side wanted a hearing); Dkt. No. 20 (joint filing from the parties stating that they "do not request a hearing on this matter, and further intend and agree that this Court rule on the papers alone").

### B.   Trademarks

Trademarks enable consumers to find what they seek while protecting businessowners' investments in their reputations. S. Rep. No. 79-1333, at 3–4 (1946). Any "word, name, symbol, or device" used "to identify and distinguish" goods in commerce can be a trademark. *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 475 (5th Cir. 2008) (quoting 15 U.S.C. § 1127). The common-law rule that "[o]ne who first uses a distinct mark in commerce . . . acquires rights to that mark" continues to hold true today. *B & B Hardware Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 142 (2015). Those rights allow the owner of the mark to prevent the use by others of similar

marks on similar goods.  *See, e.g.*, *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 368 (1924) (Holmes, J.).  A plaintiff alleging trademark infringement must prove by factual evidence that there is a likelihood of confusing the infringer's mark for the plaintiff's.  *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 117–18 (2004).

>           **i.      The Lanham Act**

"Though federal law does not create trademarks, Congress has long played a role in protecting them."  *B & B Hardware*, 575 U.S. at 142.  The "current federal trademark scheme" is set forth in the Lanham Act.  *Id.*; Trademark Act of 1946, 60 Stat. 427 (codified as amended at 15 U.S.C. § 1051 *et seq.*).  The Act has two aims:  First, to "protect the public so it may be confident that, in purchasing a product bearing a particular trade-mark which it favorably knows, it will get the product which it asks for and wants to get."  S. Rep. No. 79-1333, at 3 (1946).  And second, to "secur[e] to the owner [of a trademark] the goodwill of his business."  *Id.*

The Lanham Act allows the owner of a mark used in interstate commerce to bring infringement actions in federal court.  *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992); *see also* 15 U.S.C. § 1114(1)(a) (registered marks), § 1125(a)(1) (unregistered marks).[2] "To prevail on [a] claim of trademark infringement under the Lanham Act, [the claimant] must show two elements: (1) it possesses a legally protectable trademark and (2) [the alleged infringer's] use of this trademark 'creates a likelihood of confusion as to source, affiliation, or sponsorship.'"  *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 450 (5th

---

[2] Infringement actions under Section 1114 are reserved for registered marks, while unfair competition actions under Section 1125 are available to markholders regardless of registration. The same test applies to both.  *See John Crane Prod. Solutions., Inc. v. R2R & D, LLC*, No. 3:11-cv-3237-D, 2012 WL 1571080, at * 2 n.2 (N.D. Tex. May 4, 2012) (Fitzwater, C.J.) (citing *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 236 n.8 (5th Cir. 2010)).

Cir. 2017) (quoting *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)).

### ii.       Trademark Registration

Although registration is not a prerequisite for an owner to have enforceable rights in a mark, the Lanham Act "confers important legal rights and benefits on trademark owners who register their marks" with the Patent and Trademark Office. *Matal v. Tam*, 137 S. Ct. 1744, 1753 (2017). Federal registration serves as "constructive notice of the registrant's claim of ownership" of the mark, foreclosing certain defenses in infringement actions. 15 U.S.C. § 1072. Moreover, registrants enjoy presumptions of validity and exclusivity in any suit involving the mark. 15 U.S.C. § 1115(a); *see* § 1057(b). And, after five years of registration, a mark becomes "incontestable," depriving would-be challengers of many otherwise-available grounds for challenging the mark. 15 U.S.C. § 1065.

To obtain registration, a mark's owner must apply to the PTO with a description of the mark and evidence of its use in commerce. 15 U.S.C. § 1051(a)(2). In addition, applicants must supply a description of the goods or services with which the mark is associated. *Id.* To determine a mark's registrability, an Examiner reviews the application in accordance with the Trademark Manual of Examining Procedure (TMEP), which "outlines the procedures which Examining Attorneys are required or authorized to follow in the examination of trademark applications," and the Principal Register—where previously registered marks are published. Foreword, Trademark Manual of Examining Procedure (July 2021 ed.), *available at* https://tmep.uspto.gov/RDMS/TMEP/current. If the PTO grants the application, the mark is placed on the Principal Register, and the owner is issued

– 10 –

a certificate of registration entitling her to display the mark alongside the registration symbol—®.  McCarthy § 19:144.

The Act specifies that only distinctive marks are to be registered.  15 U.S.C. § 1052(f).  If a mark answers nothing more than "What are you?", it is not distinctive. *Advertise.com, Inc. v. AOL Advertising, Inc.*, 616 F.3d 974, 978 (9th Cir. 2010).  Rather, to be distinctive, a mark must answer "Where do you come from?"  *See generally*, *id.*; TMEP § 1209.01 (describing the distinctiveness/descriptiveness continuum).  Distinctiveness stems not from the mark itself, but from its use in context: "ivory" is distinctive as to soap but not as to items made from the tusks of elephants, for example.  *Welding Servs. v. Forman*, 509 F.3d 1351, 1358 (11th Cir. 2007).  The Supreme Court has identified five levels of distinctiveness: generic; descriptive; suggestive; arbitrary; and fanciful.  *Two Pesos*, 505 U.S. at 768; *see Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976) (Friendly, J.) (first theorizing the five levels of distinctiveness)

Marks that are suggestive, arbitrary, or fanciful are "inherently distinctive and are entitled to protection."  *Two Pesos*, 505 U.S. at 768.  Suggestive marks hint at the product's characteristics:  Orange Crush (orange-flavored soda) and Coppertone (sunblock).  McCarthy § 11:72.  Arbitrary marks provide no indication as to the product's characteristics:  Apple (electronics) and Camel (cigarettes).  McCarthy § 11:13.  And fanciful marks usually are made-up words:  Kleenex (tissues) and Kodak (film).  McCarthy § 11:8.  Meanwhile, descriptive marks highlight information about the product's features:  5-Minute Glue (quick-drying adhesive) and King Size clothing (capacious menswear).  *See Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 464 (4th Cir. 1996).

Because descriptive marks do not answer the "Who?" required to show distinctiveness, only descriptive marks that have acquired secondary meaning—an association in the minds of consumers between the mark and its source—are eligible for registration. *Two Pesos*, 505 U.S. at 766 n.4, 769; 15 U.S.C. § 1052(f). "The crux of the secondary meaning doctrine is that the mark comes to identify not only the goods but the source of those goods." *Ralston Purina Co. v. Thomas J. Lipton, Inc.*, 341 F. Supp. 129, 133 (S.D.N.Y. 1972).

The so-called *Abercrombie* analysis is less useful when considering graphic designs, however. Given that a logo will almost never be descriptive— the Polo Ralph Lauren logo is found not on polo ponies but on golf shirts—applying *Abercrombie*'s test would, in nearly every case, yield a mark that is at least suggestive and thus entitled to protection. *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 242–43 (5th Cir. 2010).

When considering marks without words, like images or symbols, the Court applies the test articulated in *Seabrook Foods, Inc. v. Bar-Well Foods Ltd.*, 568 F.2d 1342 (C.C.P.A. 1978). Determining whether a graphic is distinctive requires looking to "[(1)] whether it was a 'common' basic shape or design, [(2)] whether it was unique or unusual in a particular field, [(3)] whether it was a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods, or [(4)] whether it was capable of creating a commercial impression distinct from the accompanying words." *Id.* at 1344 (footnotes omitted); *accord Amazing Spaces*, 608 F.3d at 232. These factors are not discrete inquiries but are "variations on a theme"—namely "whether the design, shape or combination of elements is so unique, unusual or unexpected in this market that one can assume without proof that it will

automatically be perceived by customers as an indicator of origin—a trademark.'" *Amazing Spaces, Inc.*, 608 F.3d at 244 (quoting *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 40 (1st Cir. 1998), itself quoting McCarthy § 8:13).

Under *Seabrook Foods*, a red heart on a teddy bear is not distinctive because many manufacturers of teddy bears adorn their products with red hearts. *Id.* at 244–45 (citing *Wiley v. Am. Greetings Corp.*, 762 F.2d 139, 142 (1st Cir. 1985)). Indeed, hearts are common symbols, and "[a] 'common' symbol or design—lacking inherent distinctiveness—is the antithesis" of a trademark. *Id.* at 245 (citing *I.P. Lund Trading,* 163 F.3d at 40, which quoted McCarthy § 8:13); *accord* Restatement (Third) of Unfair Competition § 13, cmt. d. A star—even one set in a circle—similarly lacks inherent distinctiveness such that a viewer would immediately recognize it as an indicator of origin. *Amazing Spaces*, 608 F.3d at 245–47. Put another way, the question is whether, in the context of the items or services it accompanies, the graphic at issue "almost *automatically* tell[s] a customer that it refers to a brand." *Wal–Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 212 (2000).

Regardless of whether the mark is a word mark or a graphic, the PTO defines the scope of a trademark by registering it for one of forty-five classes of goods and services. TMEP § 1401.02(a). When evaluating an application, the PTO has directed Examiners to first determine the class of goods or services a mark applies to, then evaluate the mark's distinctiveness. TMEP § 1209.02; *see also H. Marvin Ginn Corp. v. Int'l Ass'n of Fire Chiefs*, 782 F.2d 987, 990 (Fed. Cir. 1986); *Glover v. Ampak, Inc.*, 74 F.3d 57, 59 (4th Cir. 1996). As relevant here, Class 43 covers "services for providing food and drink," while Class 25 covers "clothing, footwear, and headwear." TMEP § 1401.02(a). Registering a trademark with the

PTO is prima facie evidence that a mark is "inherently distinctive." *Streamline*, 851 F.3d at

451 (quoting *Nola*, 783 F.3d at 537); 15 U.S.C. § 1057(b).

### iii.        Infringement Remedies

Recall:  "Ownership of trademarks is established by use, not by registration." *Union*

*Nat'l Bank of Tex., Laredo, Tex. v. Union Nat'l Bank of Tex., Austin, Tex.*, 909 F.2d 839, 842 (5th

Cir. 1990).  "The first one to use a mark is generally held to be the 'senior' user and is

entitled to enjoin other 'junior' users from using the mark, or one that is deceptively similar

to it, subject to limits imposed by the senior user's market and natural area of expansion."

*Id.* at 842–43.  So "[e]ven without federal registration, a mark may be eligible for protection

against infringement under both the Lanham Act and other sources of law." *USPTO* v.

*Booking.com B.V.*, 140 S. Ct. 2298, 2302 (2020).

Indeed, Section 1114 prohibits the

> use in commerce [of] any reproduction, counterfeit, copy, or colorable
> imitation of a *registered mark* in connection with the sale, offering for
> sale, distribution, or advertising of any goods or services on or in con-
> nection with which such use is likely to cause confusion, or to cause
> mistake, or to deceive.

15 U.S.C. § 1114(1)(a) (emphasis added).  Meanwhile, Section 1125 prohibits the

> use[] in commerce [of] any word, term, name, symbol, or device, or any
> combination thereof, or any false designation of origin, false or mislead-
> ing description of fact, or false or misleading representation of fact,
> which . . . is likely to cause confusion, or to cause mistake, or to deceive
> as to the affiliation, connection, or association of such person with an-
> other person, or as to the origin, sponsorship, or approval of his or her
> goods, services, or commercial activities by another person.

15 U.S.C. § 1125(a)(1) (cleaned up).  And Section 1116(a) authorizes courts to issue

preliminary injunctions to prevent violations of Section 1125(a), which, because it does not

have a registered trademark, is the basis for the unfair-competition claim that gives rise to this motion.  *See* Dkt. Nos. 5 at 6–7; 10 at 1.

3.    **Analysis**

A preliminary injunction requires Signature Stag to demonstrate that it is substantially likely to succeed on the merits of its claim; that it will suffer irreparable injury in the absence of injunctive relief; that the balance of the equities tips in its favor; *and* that the public interest is served by the injunction.  It does so easily.

A.    **Signature Stag is likely to prevail on the merits.**

To prove trademark infringement, Signature Stag must prove that it owns a legally protectable mark in the logo and that Savage Tavern's use of the Mark creates a likelihood of confusion as to source, affiliation, or sponsorship.  15 U.S.C. § 1125(a)(1)(A); *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 483 (5th Cir. 2004); *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 450 (5th Cir. 2017); *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015).  Taking each aspect in turn.

i.    **The Mark is protectable.**

For a trademark to be protectable, it must be distinctive.  *See* 15 U.S.C. § 1052; § 1127 (defining trademark as any "word, name, symbol, or device" used "to identify and distinguish his or her goods"); *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 237 (5th Cir. 2010).  "[A] mark can be distinctive in one of two ways."  *Wal–Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210–11 (2000).  "[A] mark is inherently distinctive if '[its] intrinsic nature serves to identify a particular source.'"  *Id.* at 210 (quoting *Two Pesos*, 505 U.S. at 768) (alteration in original).  "Second, a mark has acquired distinctiveness, even if it is not inherently distinctive, if it has developed secondary meaning, which occurs when, 'in

– 15 –

the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself.'"  *Id.* at 211 (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851, n.11 (1982)).  In short, when "determining what can qualify as a trademark, it is crucial that the designation in question perform the job of identifying and distinguishing the goods or services with which the symbol appears."  McCarthy § 3:1.

Savage Tavern, by registering the Mark, essentially makes Signature Stag's case for it as to this element.  Proceeding logically:

Savage Tavern registered the Mark.　　　　　Dkt. No. 14 at 4.

To be registered, a mark must be distinctive.　　15 U.S.C. § 1052.

A distinctive mark is protectable.　　　　　15 U.S.C. § 1052(f).

∴ The Mark is protectable.

QED.

Congress rendered the foregoing largely unnecessary in Section 1115(a):  Any "registration . . . of a mark registered on the principal register provided by this chapter and owned by a party to an action shall be admissible in evidence and shall be prima facie evidence of the validity of the registered mark."  What is more, a Trademark Examiner reviewed Savage Tavern's registration application and concluded that the Mark was distinctive even without a showing of secondary meaning.  *See* Trademark Snap Shot

Publication Style Sheet, Case ID 88-777,542 (May 12, 2020) (noting "APPROVED FOR PUBLICATION" and "Section 2F:  NO").[3]

Although not obliged to do so, the Court agrees with the Trademark Examiner's conclusions.  *See Robin Singh Educ. Servs. Inc. v. Excel Test Prep Inc.*, 274 F. App'x 399, 403 n.4 (5th Cir. 2008) ("[S]everal Circuit courts have noted that federal courts are not obligated to defer to PTO proceedings nor are PTO's findings on infringement binding on federal courts.").  The Patent and Trademark Office employs staff who—day in and day out—decide whether a proposed mark is distinctive.  Even though the PTO is not the typical agency to whom deference might be owed—*see, e.g.*, 15 U.S.C. §§ 1071(b) (authorizing direct challenges to registrability denials in district courts), 1119 (authorizing direct challenges to a registration's validity in district courts)[4]—the Court finds that the Trademark Examiner's decision is further evidence of the Mark's protectability.  *See Future Proof Brands, LLC v. Molson Coors Beverage Co.*, 982 F.3d 280, 293 n.17 (5th Cir. 2020) (noting without affirming that, in the context of a word mark, the presumption of distinctiveness afforded a registered mark may be evidence that the mark is not descriptive).

---

[3] Although neither party presented it to the Court, the Court reviewed and takes judicial notice of the record of Savage Tavern's registration proceedings before the PTO.  *See* Fed. R. Evid. 201(b).  They are available through the PTO's Trademark Status & Document Review portal (https://tsdr.uspto.gov) and can be found by searching either by the Mark's serial number (88-777,542) or its registration number (6,140,413).  Multiple courts have approved of taking judicial notice of such records.  *E.g., Mobility Workx, LLC v. Unified Patents, LLC*, 15 F.4th 1146, 1151–52 & n.1 (Fed. Cir. 2021); *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004); *Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005); *Brown v. Bridges*, 3:12-CV-4947-P, 2016 WL 3660666, at *2 (N.D. Tex. Jan. 26, 2016) (Solis, J.), *aff'd*, 692 F. App'x 215 (5th Cir. 2017) (taking judicial notice of trademark registration documents as public records under Federal Rule of Evidence 201).  Importantly, however, the Court does not take judicial notice of the truth of the documents' assertions.  *See Taylor v. Charter Medical Corp.*, 162 F.3d 827, 829–31 (5th Cir. 1998).

[4] If the Court ultimately cancels Savage Tavern's registration, it would not do so because the Mark is incapable of registration.  Rather, it would do so because Savage Tavern—as a non-owner—is incapable of registering the Mark.

Even if the Court were to ignore the fact that the Mark has already been protected, Savage Tavern has conceded the point by bringing suit for infringement.  The test applied in infringement actions under Section 1114(1)(a)—which is the basis for Savage Tavern's suit against Signature Stag—depends on the Mark being protectable.  *Scott Fetzer Co.*, 381 F.3d at 483.  Thus, by filing this suit under Section 1114(1)(a), Savage Tavern conceded that the Mark is protectable.

And even if the Court were to ignore both the fact that the Mark is registered and that Savage Tavern cannot argue otherwise without dooming its own claim,[5] the Court finds that the Mark is protectable.

Like the district court in *Amazing Spaces*, the Court finds the *Abercrombie* analysis ill-suited to determining whether the Mark is distinctive and, therefore, protectable.  *Amazing Spaces, Inc. v. Metro Mini Storage*, 665 F. Supp. 2d 727, 736–37 (S.D. Tex. 2009) (Rosenthal, J.).  Nevertheless, the Court finds that the Mark is, by process of elimination, arbitrary or fanciful.  The Mark is not generic because it is found on a wide variety of apparel and is used by Savage Tavern to advertise its restaurant services; it is not used to sell revolvers with red stars on the handles.  Nor is it descriptive for similar reasons; it is not used to describe any characteristic of the items on which it appears.  Finally, it is not suggestive because the Mark does not suggest any attribute of the apparel or restaurant services it accompanies.  *Cf. Amazing Spaces*, 665 F. Supp. 2d at 737 (explaining why an encircled star was either fanciful or arbitrary when used by a self-storage company).  Because it is not generic, descriptive, or suggestive of the goods and services it accompanies, the Mark must be arbitrary or fanciful.

---

[5] The Court has no need to address the issue, but equitable estoppel would likely preclude Savage Tavern from arguing that the Mark is not protectable seeing as it hauled Signature Stag into court on the basis of the Mark's protectability.

But, like Judge Rosenthal in *Amazing Spaces*, the Court does not end its analysis there. To determine protectability, the Court must evaluate whether the Mark's intrinsic nature serves to identify a source. *See Wal–Mart Stores*, 529 U.S. at 210. Under the *Seabrook Foods* test, it does. *See* 568 F.2d at 1344.

The first prong of that test asks whether the Mark is composed of basic shapes or designs; it is not. "Common basic shapes or letters are, as a matter of law, not inherently distinctive." *Amazing Spaces*, 608 F.3d at 244 (cleaned up) (citing *Star Industries v. Bacardi & Co.*, 412 F.3d 373, 382 (2d Cir. 2005)). Rather than a circle, star, or square, or some combination of the three, the Mark involves two guns—specifically revolvers—pointing upwards and crossed at their barrels, each bearing a lone red star on its grip. If the raised, shaded, and encircled star in *Amazing Spaces* is "more than a common geometric shape," 608 F.3d at 245, the Mark is, too. The first prong is satisfied accordingly.

The second prong asks whether the Mark is "unique or unusual in the relevant market." *Amazing Spaces*, 608 F.3d at 244. In *Amazing Spaces*, the record was "replete with similar or identical five-pointed stars, both raised and set in circles, and used in similar manners, such that—notwithstanding the residual evidence of the presumption of validity—no reasonable jury could find that the Star Symbol is even a mere refinement of this commonly adopted and well-known form of ornamentation." *Id.* at 246–47. Here, by contrast, there is no evidence that third parties use the Mark or close variants of it, thus satisfying the second prong.

The third prong draws a distinction between trademarks and ornamentation: Does the viewing public believe that the Mark identifies a source, or does it merely serve as a decoration or a design element of the products on which it appears? *Id.* at 244–45. To use

an earlier example, a red heart on a teddy bear is ornamentation rather than source-signifying because many different sources of teddy bears use red hearts to ornament their wares.  *See Wiley*, 762 F.2d at 142.  The Court has no difficulty concluding that the Mark is an indicator of source rather than ornamentation.  In all of the examples before the Court (*see, e.g.*, Dkt. No. 1 at 17–29), it appears just once and occupies a relatively small portion of the garment, rather than as a repeated pattern or large feature of the garment.  *See* Dkt. Nos. 1 at 17–29; 11 at 20, 22; *see also* McCarthy § 7:24–25; *In re Lululemon Athletica Canada, Inc.*, 105 U.S.P.Q.2d. 1684, 2013 WL 326567, *2–4 (T.T.A.B. 2013) (noting that relative dominance of the mark over the garment makes the mark less likely to serve as an indicator of source); TEMP § 1202.03(a); *accord Wal–Mart Stores*, 529 U.S. at 207, 215 (holding that children's clothing "decorated with appliques of hearts, flowers, fruits, and the like" is merely product design, which required proof of secondary meaning to be protectable).  A lone logo on the upper left-hand corner of a shirt or in the center of a hat almost invariably serves as an indicator of source, so the third prong is also satisfied.  *Cf.* Oliver Wendell Holmes, Jr., *The Common Law* 1 (1881) ("The life of the law has not been logic: it has been experience.").

These prongs of *Seabrook Foods* are all "variations on a theme," though—the core inquiry is whether the public would recognize the Mark to be a trademark, regardless of whether they know the item's source.  *Amazing Spaces*, 608 F.3d at 244.  The Mark easily passes that test given its creative design, lack of lookalikes in the market, and solitary placement on the items on which it appears.  Under *Seabrook Foods*, the Mark is inherently distinctive and, thus, protectable.[6]

---

[6] The Court has no occasion to consider prong four of *Seabrook Foods*—whether the Mark was capable of creating a commercial impression distinct from the accompanying words—because no words accompany the Mark.  *See Amazing Spaces*, 608 F.3d at 232 n.5.

*                    *                    *

Either because Savage Tavern conceded the point by registering the Mark; because Savage Tavern conceded the point by bringing suit; or because the *Seabrook Foods* analysis yields only one reasonable conclusion, Signature Stag is substantially likely to prevail in showing that the Mark is protectable.

### ii.        Signature Stag is the Mark's senior user.

To succeed in an infringement action a party must also prove that it is the mark's senior user. *See Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 309 (5th Cir. 2008). "An ownership right 'accrues when goods bearing the mark are placed on the market.'" *Viacom Int'l, Inc. v. IJR Capital Investments, LLC*, 891 F.3d 178, 186 (5th Cir. 2018) (quoting *Blue Bell, Inc. v. Farah Mfg. Co.*, 508 F.2d 1260, 1265 (5th Cir. 1975)).

Signature Stag has presented unrebutted evidence that it used the Mark in commerce in 2016. Dkt. No. 11 at 8 (e-mail containing mock-up of the Mark dated June 23, 2016), 18 (sales data showing sale of items bearing the Mark on November 2, 2016). Independent evidence confirms Signature Stag's date of first use. Paul Fioroni has filed an affidavit stating that he purchased a shirt bearing the Mark in November 2016. Dkt. No. 11 at 21 (affidavit), 22–23 (photos of the shirt clearly showing the Mark). All of that happened before Savage Tavern's alleged first-use date of July 27, 2017. Dkt. No. 14 at 4. How Savage Tavern used the Mark in July 2017 when it did not open until June 2018 is unclear. *See* Dkt. No. 11 at 29 (Savage Tavern Facebook post from June 16, 2018, featuring a photograph of a banner reading "WE ARE NOW OPEN"). Regardless, since 2016 was before 2017, Signature Stag is the Mark's senior user and, therefore, owner.

Savage Tavern spends much of its brief talking about how its registration means that it owns the mark. But, again, ownership of a trademark is based on use, not registration. *Union Nat'l Bank of Tex.*, 909 F.2d at 842. Moreover, federal registration of a mark does not terminate the common law rights of a senior user. McCarthy § 16:18.50. "The nonregistered rights of a senior user continue and are not erased by the later federal registration of a junior user." *Id*. Further, Savage Tavern's registration is less than five years old—it was issued in September 2020 (Dkt. No. 1 at 4)—so all that Savage Tavern is entitled to under the Lanham Act is to use its registration certificate as prima facie evidence of its ownership of the Mark. McCarthy § 16:19; *cf.* 15 U.S.C. § 1115(b) (stating that an incontestable registration—one more than five years old—is "conclusive evidence" of the registrant's ownership).

Courts are divided as to whether the presumptions afforded to Savage Tavern under Sections 1057(b) and 1115(a) shift the burden of proof or that of production to Signature Stag. McCarthy § 32:138 (discussing split). The Fifth Circuit adopts the minority position that these presumptions shift the burden of persuasion alone. *See, e.g.*, *Igloo Prod. Corp. v. Brantex, Inc.*, 202 F.3d 814, 819 (5th Cir. 2000); *see also Custom Vehicles, Inc. v. Forest River, Inc.*, 476 F.3d 481, 486 (7th Cir. 2007) (Posner, J.) ("[T]he presumption of validity that registration creates is easily rebuttable, since it merely shifts the burden of production to the alleged infringer."). That fight is immaterial here, though: All of the evidence before the Court shows that Signature Stag is the Mark's true owner because it used the Mark in commerce before Savage Tavern did. *Dallas Cowboys Football Club, Ltd. v. America's Team Props., Inc.*, 616 F. Supp. 2d 622, 633 (N.D. Tex. 2009) (Kinkeade, J.) (cancelling registration of junior user's infringing mark); *Tinker, Inc. v. Poteet*, 3:14-CV-2878, 2017 WL

4351304, *5–6 (N.D. Tex. Sept. 30, 2017) (Lindsay, J)) (same).  And because all of the evidence is in Signature Stag's favor, it is substantially likely to succeed in proving that it is the Mark's senior user, notwithstanding any statutory presumptions to the contrary.

### iii.    Savage Tavern's use of the Mark creates a likelihood of confusion.

Confusion—not competition—is the bedrock of trademark law.  McCarthy § 24:13.  To determine whether there is a likelihood that consumers will be confused by dueling uses of a mark, the Fifth Circuit applies an eight-factor test—the "digits of confusion" test.  *Streamline*, 851 F.3d at 453.  Those eight factors are: (1) the strength of the owner's mark; (2) the similarity of design between the marks; (3) the similarity of the products; (4) the identity of retail outlets and purchasers; (5) the similarity of advertising media used; (6) the defendant's intent to confuse; (7) evidence of actual confusion; and (8) the degree of care exercised by potential purchasers.  *Id.*  No one factor is dispositive, and a finding of a likelihood of confusion does not require a finding in the plaintiff's favor on a majority of the digits.  *Nat'l Bus. Forms & Printing, Inc. v. Ford Motor Co.*, 671 F.3d 526, 532 (5th Cir. 2012).  Nor are the factors exclusive.  *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 546 (5th Cir. 1998), *abrogated on other grounds by TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23 (2001).

The Court addresses each digit independently, then conducts a holistic review to determine whether Signature Stag has demonstrated that there is a likelihood of confusion.

### a.    Digit One: Strength of the Mark

The first digit—the strength of the Mark—weighs heavily in favor of a finding of confusion.  "The type-of-mark digit refers to the strength of a mark: Strong marks receive 'the widest ambit of protection,' and weak marks do not."  *Future Proof Brands*, 982 F.3d at

289–90 (quoting *Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 315 (5th Cir. 1981)).  "To determine the strength of a mark, we examine (1) 'where the mark falls on a spectrum . . . ' of categories and (2) 'the standing of the mark in the marketplace.'"  *Id.* at 290 (quoting *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 330 (5th Cir. 2008)).  "But the strength inquiry is different from the distinctiveness inquiry in that suggestive marks don't always make the cut."  *Id.*  Likewise, "classification of the mark on the spectrum is not conclusive of strength, . . . because a descriptive mark through vigorous promotion can become a strong mark, and an arbitrary mark that is not well known in the market can be a weak mark."  *Id.* (quoting Restatement (Third) Unfair Competition § 21, cmt. i) (cleaned up).

Savage Tavern, the nonmovant, argues in its complaint that the "Mark is strong and entitled to just and broad protections under both Federal and Texas laws."  Dkt. No. 1 at 4.  That alone is enough to put this digit in favor of a likelihood of confusion.  But, once again, the Court conducts its own analysis to demonstrate that Savage Tavern's concession is not necessary for Signature Stag to carry its burden.

Three cases demonstrate how strength factors into the decision whether to grant an injunction and how other factors, in turn, affect the strength of a mark.

Start with a decision where the mark's strength weighed against an injunction, *Springboards to Education, Inc. v. Houston Independent School District*, 912 F.3d 805 (5th Cir. 2019).  Four marks were at issue there, each some variant of "Million Dollar Reader," and all used in conjunction with the plaintiff's programming to promote summer reading among school students.  *Id.* at 810.  The *Springboards* defendant "presented unrebutted evidence of numerous other literacy programs predating Springboards' 'Read a Million Words'

campaign that use phrases identical or nearly identical language to Springboards' marks." *Id*. at 815. Recognizing that "[e]xtensive third-party use of a term throughout the market suggests that consumers will not associate the junior mark's use with the senior mark user," *id*., the Fifth Circuit found that "the strength of Springboards' marks is substantially undercut by their lack of recognition in the market and widespread third-party use," despite the fact that the marks' suggestive nature "would normally indicate that the marks are strong." *Id*.

Now, a decision where strength weighed neither for nor against an injunction, *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221 (5th Cir. 2009). There, the mark was "EXTEND YOUR BEAUTY," and it was found on mascara and other makeup and beauty products. *Id*. at 225–26. The Fifth Circuit said that mark was arguably suggestive, but "appear[ed] frequently on cosmetics and grooming products," so it could not "say with certitude that [the mark] is strong or weak." *Id*. at 227–28.

Finally, a decision that weighs in favor of an injunction, *Streamline Production Systems, Inc. v. Streamline Manufacturing, Inc.*, 851 F.3d 440 (5th Cir. 2017). The mark there was a blue and white logo consisting of the word "Streamline" written on a ring, horizontally encircling a drawing of a piece of natural gas production equipment. *Id*. at 447. The Fifth Circuit found that, despite being suggestive, the mark's strength weighed in favor of a likelihood of confusion because there was no evidence that third parties used the mark. *Id*. at 454.

Of the three, *Streamline* is most analogous to this case given the lack of evidence that third parties use the Mark. Even if the Court were to ignore *Streamline* and *Xtreme Lashes*, *Springboards*—like the other two—involved only a suggestive mark. Although the Court

does not rely on the *Abercrombie* analysis to determine whether the mark is protectable, that analysis is useful, but not dispositive, when considering strength. Recall, under the *Abercrombie* analysis, the Mark is either arbitrary or fanciful because it does not suggest any qualities of the products on which it appears. If a suggestive mark "weighs in favor of finding a likelihood of confusion," *id.* at 454, then an arbitrary or fanciful mark does, too.

Moreover, even if the Court were to consider the fact that the Mark is designed to invoke an association with Texas Tech University—thus putting it alongside the marks in *Springboards*—that would be insufficient for the Court to conclude that the Mark is not strong. The Fifth Circuit confronted a similar scholastic situation in *Board of Supervisors v. Smack Apparel Co.*, 550 F.3d 465 (5th Cir. 2008). There, the plaintiffs were various universities who sued an apparel company that designed and sold shirts adopting color schemes identical to each school's and referencing various athletic achievements by each school. *Id.* at 472–73. The universities argued "that each schools' color combination acts as a source-identifier for the respective schools, especially when used in connection with other indicia identifying or suggesting the schools," and that "the sale of Smack's products [was] likely to deceive, confuse, and mislead consumers into believing that Smack's products [were] produced, authorized, or associated with the plaintiff Universities." *Id.* at 473. When evaluating the first digit, the Fifth Circuit concluded that each mark was strong. *Id.* at 479. And the Fifth Circuit rejected Smack's argument that the use of the color scheme by other businesses near the respective university diminished the public's impression that the color schemes were associated with the universities. *Id.*

In this case, however, the Mark is not Texas Tech's color scheme, and Texas Tech is not a party to this suit. The Mark is an original graphic created by Signature Stag's owner.

Certainly, the Mark incorporates Texas Tech's colors—red, white, and black—and is likely inspired by the University's "Guns up!" hand sign.  But Signature Stag has a longstanding licensing relationship with Texas Tech, Dkt. No. 5 at 15–16, and Signature Stag created the graphic to complement its officially licensed products.  *Id.* at 3, 19–21.  Savage Tavern's decision to adopt the Mark and to start placing it on apparel demonstrates that the Mark is an indicator of more than merely an affiliation with Texas Tech, but as an indicator of quality.  Indeed, Savage Tavern could have designed its own logo to complement Texas Tech's imagery.  It chose a different path.  The creative nature of the Mark, coupled with the lack of evidence of its use by third parties, leads the Court to conclude that the Mark is strong.

Thus, either because Savage Tavern has conceded that the Mark is strong or because the Mark is actually strong, this digit weighs in favor of a likelihood of confusion.

### b.      Digit Two: Similarity of the Marks

This suit stems from cross-allegations of infringement over the same trademark.  Similarity implies comparison, but there is no similarity here: there is only identicality.  Given that just one mark is at issue, this digit weighs very heavily in favor of a finding of confusion.

Huey's affidavit does speak of changes to various manifestations of the Mark, but the description of those changes is vague:  "After receiving the demand and lawsuit from Savage Tavern, I noticed that the initial mark that Savage Tavern used was less similar and had been changed to the mark that is now being claimed.  I have observed increased similarities in the more recent mark to the graphic that Signature Stag has used and sold on apparel since 2016."  Dkt. No. 11 at 4.  No specific differences are pointed out, so the Court

gives Huey's statements little weight.  Based solely on the graphic contained within Savage

Tavern's registration (Dkt. No. 14 at 4) and that on Fioroni's shirt purchased in 2016 (Dkt.

No. 11 at 23)—the earliest iterations from each party—the Court finds that this factor

weighs heavily in favor of a finding of a likelihood of confusion.

### c. Digit Three: Similarity of the Products

"The greater the similarity between the products and services, the greater the

likelihood of confusion."  *Exxon Corp. v. Texas Motor Exch. of Houston*, 628 F.2d 500, 505 (5th

Cir 1980).  "[G]oods that are neither used together nor related to one another in kind may

still 'be related in the mind of the consuming public as to the origin of the goods.  It is this

sense of relatedness that matters in the likelihood of confusion analysis.'"  *Shen Mfg. Co., Inc.*

*v. Ritz Hotel, Ltd.*, 393 F.3d 1238, 1244 (Fed. Cir. 2004) (quoting *Recot, Inc. v. Becton*, 214

F.3d 1322, 1329 (Fed. Cir. 2000)).

Savage Tavern does not contest that it sells apparel bearing the Mark, and the hats'

similarities speak for themselves.  Savage Tavern's primary focus, however, is as a

restaurant and bar.  That is of little import, here, though: "the fact that the goods or services

fall in different parts of the USPTO classification system is totally irrelevant to the issue of

likelihood of confusion."  McCarthy § 24:6.  "Goods are 'related,' *not* because of any

inherent common quality of the respective goods, but 'related' in the sense that buyers are

likely to believe that such goods, similarly marked, come from the same source, or are

somehow connected with or sponsored by a common company."  McCarthy § 24:24; *see also*

*Kookaï, S.A. v. Shabo*, 950 F. Supp. 605 (S.D.N.Y. 1997) (finding relatedness sufficient to

support a likelihood of confusion between KOOKAÏ used on women's clothing and

fragrances and a women's clothing store named KIKAI).

Thus, the question is whether Savage Tavern's adoption of the Mark for any of its services is likely to give rise to confusion about an association between it and Signature Stag. Although the primary products and services offered by each party differ in this case, there still a likelihood, given that the mark is a unique, that consumers will generate an association between the two parties. This is not a situation like *Shen Manufacturing*, where one party offered cooking classes under the "Ritz" label and another manufactured dish towels under the same label. 393 F.3d at 1244. There, the Federal Circuit reversed the PTO's determination that the products were related because, although a cooking class will likely involve the use of a dishtowel, it is improbable that the average consumer would assume a common source. *Id.* at 1244–45. The use of two goods in the same setting does not, without more, render them related for the purposes of this digit.

Nor is this a situation like *In re Coors Brewing Co.*, which involved "Blue Moon." 343 F.3d 1340 (Fed. Cir. 2003). There, Coors sought to register the label for its now-ubiquitous wheat beer, Blue Moon. *Id.* at 1341. The PTO denied the application because a number of restaurants used "Blue Moon" in their name. The Federal Circuit reversed, holding that the Trademark Trial and Appeal Board erred in concluding that restaurant services and beer are related. *Id.* While some brewpubs might brew their own beer, the Federal Circuit found that fact insufficient to deem beer and restaurant services so related that a drinker of *a* Blue Moon might conclude that it came from *the* Blue Moon. *Id.* at 1346.

This case is different. Savage Tavern is a single company that uses the Mark in connection with both types of goods and services at issue, a fact that is relevant to the analysis. *Hewlett-Packard Co. v. Packard Press, Inc.*, 281 F.3d 1261, 1267 (Fed. Cir. 2002). Although there is no hard and fast "under the same roof" rule, *see* § McCarthy 24:45, Savage

Tavern's decision to bridge the gap between restaurant services and apparel is strong evidence that, in this case, the two are related.

Even if Savage Tavern did not sell apparel with the Mark, restaurants often do sell apparel bearing their name or logo or require their employees to wear the same while at work. Someone familiar with Savage Tavern who walks into Signature Stag and sees a shirt bearing the Mark might fairly be confused as to the shirt's origin or the association between Signature Stag and Savage Tavern based solely on the common practice of restaurants selling complimentary, peripheral goods bearing their logos. Indeed, given the potential overlap of customers for the goods and services of both parties, as explained below, there is ample evidence to support a finding that the goods and services are related in the sense that their dueling use of the Mark is likely to lead to consumer confusion. *See In re Shell Oil Co.*, 992 F.2d 1204, 1207 (Fed. Cir. 1993). Accordingly, this digit, too, weighs in favor of a likelihood of confusion.

### d.    Digit Four: Identity of Outlets & Purchasers

"The smaller the overlap between the retail outlets for and the predominant consumers of [each party's] goods, the smaller the possibility of confusion." *Streamline*, 851 F.3d at 455. There are at most three outlets at issue in this case: the Midland and Lubbock locations of Signature Stag and Savage Tavern's lone location. Both parties operate in Lubbock, while Signature Stag's reach extends further by virtue of its Midland location and its digital sales presence. And both parties cater to those with an affinity for Texas Tech, but some of Savage Tavern's customers may visit out of convenience or preference for the food or atmosphere. Given that there is likely direct overlap in customers—Paul Fioroni, for one—and the relatively circumscribed area in which both

operate, the Court is inclined to put this digit in favor of a likelihood of confusion.  There is, however, virtually no evidence as to the typical customer for each.  Indeed, part of Signature Stag's discontent stems from a perceived difference in the parties' clientele.  So while there is both direct and circumstantial evidence of overlap, the Court regards this digit as neutral.

### e.   Digit Five: Similarity of Advertising Media

"The greater the similarity in the advertising campaigns, the greater the likelihood of confusion." *Streamline*, 851 F.3d at 455 (brackets omitted).  The Court has little evidence before it as to the advertising media each party employs.  There is evidence that Savage Tavern uses Facebook.  Dkt. No. 11 at 29–31.  Savage Tavern alleges (Dkt. No. 1 at 6, ¶ 24), and Signature Stag concedes (Dkt. No. 4 at 3, ¶ 14), that Signature Stag also uses social media to advertise its products.  But using social media to advertise is now commonplace.  Without more detail as to the form of the advertisements placed on social media, which platforms each party uses, whether there is overlap in followers or engaged parties, and whether the advertisements are passive (an account others can find) or active (an account that pays for promotion to users in a set market), it is difficult to know how the parties "use" the Mark to advertise.  Regardless, the Fifth Circuit has stated that "[t]he use of a mark in advertising is highly probative of whether the mark creates a likelihood of confusion in relation to another mark." *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 197 (5th Cir. 1998).  And no one seems to contest that both sides "use" the Mark in their respective advertisements, so the Court finds that this digit weighs in favor of a finding of a likelihood of confusion.  This finding is further supported by the fact that Savage Tavern technically has a service mark and, "[i]n the case of a service mark, advertising is of even

greater relevance because the mark cannot be actually affixed to the service, as a trademark is to the goods."  *Id.*

The Court thus weighs this digit in favor of a likelihood of confusion.  In doing so, it gives this factor considerable weight.  The purpose of a logo like the Mark is to serve as an advertising shortcut.  Every time a purchaser wears a piece of apparel bearing the Mark, he becomes an advertisement to other would-be purchasers in the relatively small market for Texas Tech–affiliated garb.  Compared to an item like cologne or a piece of natural gas equipment, where a trademark's utility is largely exhausted after a purchase is complete, this Mark—like other clothing logos—serves another purpose: to immediately and obviously distinguish the wearer as one affiliated with the Mark's source.  So although the Court does not have direct evidence as to how extensively or prominently the Mark features in each party's advertising, the Mark itself—either as Savage Tavern's service mark or as a logo on Signature Stag's apparel—*is* ongoing public advertising, which weighs heavily in favor of a likelihood of confusion.

### f.      Digit Six: The Defendant's Intent to Confuse

Intent is usually irrelevant, for trademark infringement is a no-fault business tort, but proof of an infringer's desire to confuse consumers "may alone be sufficient to justify an inference that there is a likelihood of confusion."  *Viacom*, 891 F.3d at 195 (quoting *Streamline*, 851 F.3d at 455); *see also Fuji Photo Film Co., Inc. v. Shinohara Shoji K.K.*, 754 F.2d 591, 596 (5th Cir. 1985).  The intent inquiry "focuses on whether the defendant intended to derive benefits from the reputation of the plaintiff."  *Streamline*, 851 F.3d at 455.  "In some situations, the defendant's use of the mark with 'knowledge' of the senior user's mark "may give rise to a presumption that the defendant intended to cause public confusion.'"  *Id.*

(quoting *Scott Fetzer Co.*, 381 F.3d at 486).  Knowledge alone does not, however, establish bad intent.  *Id.* at 455–56; *see also Firebirds Int'l, LLC v. Firebird Rest. Grp., LLC*, 397 F. Supp. 3d 847 (N.D. Tex. 2019) (finding that, although the junior user may have been aware of the trademark before adopting and using it, "awareness of the Plaintiffs mark, coupled with continued use after awareness, is not sufficient to establish bad intent").

But "evidence that the defendant made efforts 'to pass off its product as that of the plaintiff' through 'imitation of packaging material' or 'adopting . . . similar distribution methods'" can support a finding of an intent to confuse.  *Streamline*, 851 F.3d at 456 (quoting *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 263 (5th Cir. 1980)) (cleaned up). Likewise, evidence that the defendant knew of the plaintiff's mark and intended to capitalize on the plaintiff's popularity can support a finding of an intent to confuse.  *Id.*  And, most importantly for present purposes, the Fifth Circuit has found an intent to confuse when the defendant did not adopt the mark with the intent to confuse, but later used the mark in a way that "evidenced an intent to trade on the senior user's reputation."  *Id.* at 456 (quoting *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 666 (5th Cir. 2000)) (cleaned up).

Here, there is no evidence that Savage Tavern adopted the Mark intending to confuse consumers.  Signature Stag offers nothing to suggest that Savage Tavern was aware of the Mark *before* it opened its doors in June 2018.  However unlikely it is that Savage Tavern happened to independently design the same exact Mark that Signature Stag used, *but see id.* (noting that the junior users presented an entirely plausible explanation as to how they arrived at the name "Streamline" for their services), the Court has been presented with insufficient evidence to find that there was an intent to confuse at the time Savage Tavern first adopted the Mark.

There is, however, ample evidence that Savage Tavern took affirmative steps to imitate Signature Stag's products with full awareness of Signature Stag's use of the Mark on similar products.  Signature Stag has offered unrebutted evidence that Savage Tavern— through Brandon Fuller—was aware of Signature Stag's use of the Mark on apparel since Huey and Fuller met at the Metallica concert in 2019.  Dkt. No. 11 at 4.  Savage Tavern had been using the Mark since June 2018, but it had only done so in relation to its restaurant and bar services.  In 2020, it applied for and received a registration to use the Mark for those services alone.  Dkt. No. 1 at 12.  At some point, it went beyond those services and began selling apparel—which is all that Signature Stag does—featuring the Mark.  Savage Tavern offers no explanation as to why it elected to expand its use of the Mark, and the evidence before the Court supports only one reasonable inference: that it did so to compete with Signature Stag.  That Savage Tavern believed that *it* was the Mark's senior user—claiming that, "by the USPTO giving sole ownership of the Mark to Plaintiff . . . this is enough [to show] that Defendant is the infringer of Plaintiff's Mark,"[7] Dkt. No. 13 at 4 (Latin phrase omitted)—is irrelevant because the question is not intent to *infringe* but intent to *confuse*.

Given all of the foregoing, the Court finds that there is evidence of an intent to confuse on Savage Tavern's part.  The Court reaches that finding without even considering the suspicious and highly convenient dates on Savage Tavern's trademark registration, noting a "first use in commerce" date of July 31, 2017.  Signature Stag's Lubbock store opened in August 2017.  How Savage Tavern used the Mark eleven months before it opened is unexplained.  But there is more than enough evidence to support a finding of an intent to

---

[7] *But see infra* at Section 3.E.ii.

confuse notwithstanding the PTO record, so the Court does not consider the PTO record when evaluating this digit.

Since there is evidence of an intent to confuse, this digit weighs in favor of a likelihood of confusion.[8]

### g.    Digit Seven: Evidence of Actual Confusion

"There can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion."  *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir. 1971).  A senior user can show actual confusion by using anecdotal instances of consumer confusion, systematic consumer surveys, or both, *Scott Fetzer Co.*, 381 F.3d at 486, and needs to provide "very little proof of actual confusion . . . to prove the likelihood of confusion."  *Xtreme Lashes*, 576 F.3d at 229.  Even if the anecdotes are minor and isolated, "courts may not ignore competent evidence of actual confusion."  *Id.* at 230.  Thus, "[t]estimony of a single known incident of actual confusion by a consumer has been found to be sufficient evidence to support the district court's finding of actual confusion."  *Streamline*, 851 F.3d at 457 (citing *La. World Exposition v. Logue*, 746 F.2d 1033, 1041 (5th Cir. 1984)).  "And, if the plaintiff provides proof of actual confusion, the defendant must provide 'an almost overwhelming amount of proof . . . to refute such proof.'"  *Id.* (quoting *Xtreme Lashes*, 576 F.3d at 230, itself quoting *World Carpets*, 438 F.2d at 489).

---

[8] Given that the Court finds that there is evidence of intent to confuse, the Court need not wade into the conflict in Fifth Circuit precedent pointed out by Judge Smith in *Future Proof Brands* as to whether the absence of intent means this factor is neutral, or whether the absence of intent weighs against a likelihood of confusion.  982 F.3d at 296 & n. 24.

Here, the evidence before the Court as to actual confusion is checkered.  Natalie Huey—Signature Stag's owner—says that she was confused as to the origin of a hat she saw someone wearing; the wearer corrected her, stating that the hat came from Savage Tavern rather than Signature Stag.  Dkt. No. 11 at 4.  But the confusion of the consumer, rather than a party, is the focus of the inquiry.  *Elvis Presley Enters.*, 141 F.3d at 203.  Nevertheless, that Huey would mistake another's wares for her own suggests that the average consumer would, too.  Huey, presumably, knows her products better than anyone else.  But, out of an abundance of caution, the Court excludes Huey from its actual-confusion analysis.

Evidence suggesting actual confusion remains even after excluding Huey's testimony from the calculus.  Paul Fioroni signed a sworn affidavit stating that he "observed [the Mark] on advertising for Savage Tavern on apparel, particularly a hat, and initially was confused as to the source of the graphic, thinking it was a product of Signature Stag."  Dkt. No. 11 at 21; *see Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160-61 (5th Cir. 2021) ("Where self-interested affidavits are otherwise competent evidence, they may not be discounted just because they happen to be self-interested. . . .  How much weight to credit self-interested evidence is a question of credibility.").  Fioroni has competently testified that he was confused "by the trademarks employed."  *Xtreme Lashes*, 576 F.3d at 230.

There is a wrinkle, however:  Fioroni did not actually purchase the confusing hat, and the Fifth Circuit's caselaw is muddled as to whether a sale is required for proof of actual confusion.  In *Streamline,* the Fifth Circuit wrote that, to show actual confusion, a party "must show that '[t]he confusion was caused by the trademarks employed and *it swayed consumer purchases*.'"  851 F.3d at 440 (emphasis added) (quoting *Xtreme Lashes*, 576 F.3d at 230).  *Streamline* relied on *Louisiana World Exposition*, where the district court had heard

testimony from a consumer who purchased a t-shirt from the defendant thinking that it was the plaintiff's product.  851 F.3d at 457.  *Streamline* also said that lost profit was irrelevant to showing actual confusion, then somewhat confusingly added the language from *Xtreme Lashes* that "we merely require that the confusion 'sway[ ] consumer purchases.'"  *Id.* at 458 (quoting 576 F.3d at 230).  But it is unclear how—as a matter of arithmetic—confusion can sway purchases without causing lost profits.  Further adding to the confusion, *Streamline* cited *Elvis Presley Enterprises*'s statement that "[i]nfringement can be based upon confusion that creates initial consumer interest, even though no actual sale is finally completed as a result of the confusion."  *Id.* (quoting 141 F.3d at 204).  *Elvis Presley Enterprises* itself added that "[a]ctual confusion that is later dissipated by further inspection of the goods, services, or premises, as well as post-sale confusion, is relevant to a determination of a likelihood of confusion."  141 F.3d at 203–04.  That "actual confusion" can be "dissipated by further inspection" while remaining distinct from "post-sale confusion" seems to imply that "actual confusion" can exist before a sale.

All of this is to say that district courts would be well served by a clear statement one way or the other as to whether a sale is required for there to be actual confusion, or whether well-documented initial-interest confusion is "actual confusion."  In the meantime, the Court adopts the more conservative view—that there must be an actual sale for there to be actual confusion.  And given that Fioroni did not actually make a purchase, his experience does not count as one of "actual confusion."

That neither Huey nor Fioroni were actually confused does not mean this digit cannot weigh in Signature Stag's favor, though.  Although "a single known incident of actual confusion by a consumer has been found to be sufficient evidence to support [a]

finding of actual confusion," the actual-confusion digit can "weigh in favor of finding a likelihood that a significant number of people were confused even if it does not show that a significant number of people were *actually* confused." *Streamline*, 851 F.3d at 457. Again, "'[i]nfringement can be based upon confusion that creates initial consumer interest, even though no actual sale is finally completed as a result of the confusion.'" *Elvis Presley Enterprises*, 141 F.3d at 204 (quoting McCarthy § 23:6). "Initial-interest confusion gives the junior user credibility during the early stages of a transaction and can possibly bar the senior user from consideration by the consumer once the confusion is dissipated." *Id.*

While Fioroni did not make a purchase, his confusion was more than a "fleeting mix-up of names," such as when a consumer "might say Bloomingdale's when they mean Neiman Marcus, or Pepsi instead of Coke." *Xtreme Lashes*, 576 F.3d at 230. Fioroni engaged in inductive reasoning when he saw a hat bearing a logo with which he was familiar. Based on his experience with that logo, he hypothesized that the hat was made by Signature Stag—the party he believed to be responsible for the logo. That his conclusion was untrue does not disprove his starting premise—that the logo is Signature Stag's. Had Fioroni purchased the hat on the basis of his faulty premise, actual confusion would have been proven. Fioroni's exercise of due diligence that led him to discover his error should not weigh against Signature Stag, particularly given that one of the main functions of a trademark is to "reduce[] the consumer's costs of shopping and making purchasing decisions." *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 163–64 (1995). Fiorini's initial-interest confusion therefore supports a finding of a likelihood of confusion.

In short, although there is no evidence of "actual confusion" as the Fifth Circuit has defined the term, this digit weighs in favor of a finding of a likelihood of confusion. One of

Signature Stag's customers confused a Savage Tavern hat for a Signature Stag hat.  No sales occurred as a result of this confusion, so it does not count as "actual confusion," but it strongly suggests that a consumer would be confused by Savage Tavern's use of the Mark.

Or, alternatively, the Court can take Savage Tavern at its word:  "Defendant's acts as above set forth have indeed led to and caused *actual market confusion* as such pertains to customers and prospective customers of Plaintiff."  Dkt. No. 1 at 8 (emphasis added). Either way, the digit weighs in favor of a likelihood of confusion.

> ### h.   Digit Eight: Degree of Care Exercised by Potential Purchasers

Whether customers are likely to exercise substantial care in differentiating the senior user's products from the junior's depends in no small part on the price they are asked to pay for each.  "Where items are relatively inexpensive, a buyer may take less care in selecting the item, thereby increasing the risk of confusion."  *Smack Apparel*, 550 F.3d at 483. "Confusion is more likely, . .  if the products in question are 'impulse' items or are inexpensive."  *Sno-Wizard Mfg., Inc. v. Eisemann Prods. Co.*, 791 F.2d 423, 428 (5th Cir.1986). Confusion on the part of *either* party's customers matters, not just confusion on the part of those seeking the senior user's goods.  *Fuji Photo Film Co.*, 754 F.2d at 596.  "[A] high price tag alone does not negate other [digits of confusion], especially if the goods or marks are similar."  *Xtreme Lashes*, 576 F.3d at 231.

Consider the quintessential example—an expensive handbag.  A purchaser seeking a genuine version will exercise caution and ensure that the item she is paying for is the real deal.  If the seller offers the bag at a price below what the buyer could reasonably expect to pay, alarm bells should go off in the shopper's head that she may not be getting the product she seeks.  The inverse price-confusion correlation makes sense given the dual functions of a

trademark.  Consumers are looking to make decisions quickly and will spend less time investigating small decisions—those with inherently less downside risk—than they will investigating big decisions.  As a general rule, then, the lower the price of the item, the less care consumers will exercise in making purchasing decisions.

Here, Signature Stag sells shirts bearing the Mark for around $90.  Dkt. No. 11 at 18–19.  Baseball hats are also a key product in this case, but there is no evidence as to the prices charged by each party for their respective hats—presumably the hats are sold for less than the shirts.  Regardless, this is not a case about $100,000 pieces of drilling equipment like *Streamline*.  851 F.3d at 458.  These are not purchases by consumers who "are buying for professional and institutional purposes at a cost in the thousands of dollars, [and who] are virtually certain to be informed, deliberative buyers."  *Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 173 (5th Cir.1986) (citations omitted).  Nor is this a case about expensive handbags.

Other district courts across the country have tried to draw a line between ordinary apparel and luxury items with mixed results.  *E.g.*, *H-D U.S.A., LLC v. SunFrog, LLC*, 311 F. Supp. 3d 1000, 1034–35 (E.D. Wis. 2018) ("Even if one accepts that Harley-Davidson's licensed apparel is high-quality and more expensive than similar unlicensed apparel, it is indisputable that the average retail consumer will not exercise great care and discretion in buying ordinary apparel unlike, perhaps, costly Coach handbags.") (citations omitted); *Icebreaker Ltd. v. Gilmar S.P.A.*, 911 F. Supp. 2d 1099, 1110 (D. Or. 2012) ("Defendant's clothing, however, unlike the clothing at issue in *Fortune Dynamic* or inexpensive t-shirts, is designer clothing shown on runways in Milan and sold by models and celebrities.  It is generally quite expensive and includes items that retail for approximately $3,000 'very

easily.'"); *Aime Leon Dore, Inc. v. TASTR. GmbH*, No. 20-CV-934 (MKB), 2021 WL 6797294, at *9 (E.D.N.Y. Jan. 8, 2021) ("Plaintiff states that its logo-style shirts sell for $85, its crest crewnecks sell for $225, and its French style terry rugby shirts sell for $205 each. . . . Because the products at issue are retail apparel and inexpensive, this factor favors Plaintiff."); *but see Tommy Bahama Grp., Inc. v. Sexton*, No. C07-06360 EDL, 2009 WL 4673863, at *10 (N.D. Cal. Dec. 3, 2009) ("The evidence . . . shows that the accused shirts were listed on eBay for sale between $64.99 and $84.00.  It is reasonable that consumers paying such a price for a shirt on eBay would be likely to exercise a relatively high degree of care in making their purchases."), *aff'd*, 476 F. App'x 122 (9th Cir. 2012).

There is no evidence as to how much Savage Tavern charges for its goods or the price of Signature Stag's hats, which complicates the Court's analysis of this digit.  While $90 may be a lot for a shirt in West Texas, *see Smack Apparel* 550 F.3d at 483 (finding $18 t-shirts to be inexpensive impulse purchases), the Court cannot say with confidence that this is a case about "expensive" goods as the law understands the term.  *See Body Support Sys., Inc. v. Blue Ridge Tables, Inc.*, 934 F. Supp. 749, 757 (N.D. Miss. 1996).

Price is not the be all and end all of this digit, however.  *Future Proof Brands*, 982 F.3d at 297.  Affidavits or testimony is often used to show the degree of care a consumer might exercise.  *Id*.  Paul Fioroni offered an affidavit indicating that he was confused as to the origin of one of Savage Tavern's hats bearing the Mark, but later inspected it and discovered that it was not from Signature Stag as he initially believed.  Dkt. No. 11 at 21.  This evidence suggests that at least some consumers would exercise the care necessary to distinguish the party's goods.  But this evidence is not conclusive for at least two reasons.  First, Fioroni was familiar with Signature Stag's products, having previously purchased

them, and was thus naturally more likely to inquire when he encountered the Mark in an unexpected place.  Second, the confusion the Court must be concerned with is not just that of the senior user's customers, but the junior user's as well.  Savage Tavern's customers may be familiar with the Mark from external exposure—that is, seeing it while walking down the street—and impute an affiliation between the items they saw in public with Savage Tavern. Fioroni's experience tells us nothing about that possibility or how such an individual would go about determining the true origins of the Mark.

All of this suggests that consumers will exercise some, but not much, care when making two-digit clothing purchasing decisions.  Thus, the Court views this digit as slightly favoring a likelihood of confusion given the relatively low price of the items at issue, but gives this digit little weight in its overall analysis given the ambiguous caselaw and sparse evidence before it.

*       *       *

Synthesizing the digits—seven of which weigh in favor of a likelihood of confusion, one neutral, and none against—the Court finds that Signature Stag has demonstrated by clear and convincing evidence that it is likely to succeed in showing that consumers are likely to be confused or deceived by Savage Tavern's use of the Mark.

Most important in the Court's weighing are Digits 2 (similarity of the mark), 5 (advertising methods), 6 (intent), and 7 (actual confusion).  The Mark is highly original and both parties use it unaltered.  That both parties also use it in their advertising means there is, even among noncustomers, a strong likelihood of confusion as to the relationship between the two.  Savage Tavern's intent in electing to begin producing items that are, in all material

– 42 –

respects, identical to those Signature Stag sells is particularly concerning, especially given the evidence that there has been some sort of confusion in the marketplace.

Of course, the likelihood of confusion analysis is largely unnecessary. Like so much else in this case, Savage Tavern concedes the point: "Defendant's use of the Mark in commerce is likely to deceive or cause confusion or mistake as to the source or origin of Plaintiff's goods and services." Dkt. Nos. 1 at 8; 13 at 7 ("Defendant has knowingly infringed upon Plaintiff's registered Mark; and, such infringement is likely to cause confusion, mistake, or deceive patrons within Lubbock, TX, and the surrounding adjacent areas where Plaintiff has an advertising presence."). So, as an alternative and independent basis for finding that Signature Stag is substantially likely to succeed on the merits, the Court finds that Savage Tavern has conceded that there is a likelihood of confusion stemming from its use of the Mark on both the goods and services that it offers.

### B.   Signature Stag faces irreparable injury absent an injunction.

The second factor to consider when confronted with a request for a preliminary injunction is whether the movant will suffer irreparable injury absent preliminary relief. The Court finds that Signature Stag will suffer such an injury.

#### i.   The Lanham Act's bursting bubble presumption places a heavy thumb on the scale in favor of a preliminary injunction.

In 2020, Congress amended the Lanham Act to clarify that irreparable injury is presumed in cases of trademark infringement. Pub. L. No. 116-260, § 221(a), 134 Stat. 1182, 2208 (December 27, 2020) (amending 15 U.S.C. § 1116(a)). That amendment—Section 221(a)—added the following language to the provision authorizing injunctions to protect unregistered trademarks:

– 43 –

> A plaintiff seeking [an] injunction shall be entitled to a rebuttable presumption of irreparable harm upon a finding of a violation identified in this subsection in the case of a motion for a permanent injunction or upon a finding of likelihood of success on the merits for a violation identified in this subsection in the case of a motion for a preliminary injunction or temporary restraining order.

Section 221(b) of the 2020 amendment, meanwhile, clarified that subsection (a)'s presumption "shall not be construed to mean that a plaintiff seeking an injunction was not entitled to a presumption of irreparable harm." 134 Stat. at 2208. That makes sense given that "[t]rademark protection has roots in common law and equity." *USPTO v. Booking.com B.V.*, 140 S. Ct. 2298, 2302 (2020); *see* Robert G. Bone, *Hunting Goodwill: A History of the Concept of Goodwill in Trademark Law*, 86 B.U. L. Rev. 547, 561–67 (2006).

The leading commentator writes that, "[b]y showing a likelihood of success in proving a likelihood of confusion, plaintiff also shows that, pending a trial without a preliminary injunction, it will probably lose control of its reputation." McCarthy § 30:47. "Because of the likelihood that confused persons may mistakenly attribute to plaintiff defects or negative impressions they have of defendant's goods or services, the plaintiff's reputation is threatened: it is in the hands of the defendant." *Id*. The Fifth Circuit agreed, even before the 2020 amendment: "'All that must be proven to establish liability and the need for an injunction against infringement is the likelihood of confusion—injury is presumed.'" *Abraham v. Alpha Chi Omega,* 708 F.3d 614, 627 (5th Cir. 2013). It went on: "there seems little doubt that money damages are 'inadequate' to compensate [the owner] for continuing acts of [an infringer]." *Id.*

Signature Stag has demonstrated that there is a likelihood of confusion, so there is a likelihood of an irreparable injury, too. Savage Tavern recognizes as much when it seeks an injunction and other equitable relief in its complaint. Dkt. No. 1 at 9–11. Indeed, Savage

– 44 –

Tavern makes no effort to rebut the Lanham Act's presumption that irreparable injury flows from the Mark's misuse.

### ii.    Disgorgement will not make Signature Stag whole.

Trademarks are not patents; they are not copyrights.  Trademarks protect more than just a property right—they protect dignitary rights, too.  And "[u]nlike a patent or copyright, a trademark does not exist 'in gross' or by itself, apart from the goodwill it represents." McCarthy § 6:3.  A business is entitled to protect its good name just as a private individual is.  Two harms flow from the infringement of a trademark, then.

The first harm is quantifiable.  Savage Tavern sold hats (and perhaps other apparel) with Signature Stag's trademark on them.  Signature Stag would be entitled to disgorge Savage Tavern of any profits it gained from the sale of the infringing goods.  Presumably Savage Tavern has records of those sales that it could produce in order to ascertain the amount of any award to Signature Stag—or vice versa, should the merits ultimately go the other way.  The point is that ill-gotten gains are readily calculable as between businesses that maintain accurate records.  Those harms would not be sufficient to warrant a preliminary injunction because they are not irreparable.

But the second harm is not readily calculable.  Trademarks identify a good's source. A necessary consequence of that identification is that the good becomes bound up with the public's perception of the source, for better or for worse.  Savage Tavern has hosted "vibrator races" in which sex toys are switched on, then placed at the top of an inclined track to see which one comes in first.  Dkt. No. 11 at 30.  It also has hosted "Wake & Bake" brunches—the idea being that patrons get high (and, thus, hungry), then go for pancakes. *Id.* at 31.  Signature Stag does not want to be associated with such activities.  A reasonable

consumer might have a negative impression of Savage Tavern's activities and carry those associations with them to Signature Stag.  The Court cannot determine how many sales Signature Stag has lost because consumers do not want a hat bearing a logo they associate with Savage Tavern.  While the Court may be able to fix ill-gotten gains—the hats purchased from Savage Tavern rather than Signature Stag—with precision, there is no way for the Court to accurately determine Signature Stag's unrealized gains.

Signature Stag loses other incalculable benefits from Savage Tavern's infringement, too.  Owners of Signature Stag garments who—like Paul Fioroni—learn that Savage Tavern also uses the Mark might choose not to wear their Signature Stag apparel, depriving them of the use of their property.  That decision, in turn, denies Signature Stag the advertising benefit it gains when purchasers wear clothes bearing the Mark.  And that harm, too, is incalculable.

In short, Signature Stag does not want to be associated with Savage Tavern, it has a right not to be.  *See generally* 15 U.S.C. § 1125(a)(1)(A) (prohibiting the use of a mark when such use is likely to "deceive as to the affiliation, connection, or association of such person with another person").  And it has a right to prevent Savage Tavern from using its trademarks when doing so would lead to an association between the two.  *See* 15 U.S.C. § 1116(a).  Only a preliminary injunction can prevent irreparable harm in this case.[9]

---

[9] Savage Tavern does not invoke laches in its brief in opposition to Signature Stag's motion, so it has waived that argument.  In any event, laches would have offered Savage Tavern little relief because Signature Stag swiftly counterclaimed and moved for a preliminary injunction when confronted with Savage Tavern's suit.

C.   **The balance of the equities favors an injunction.**

The Court must consider the equities when determining whether to grant a preliminary injunction.  If the harm to the nonmoving party that will flow from a preliminary injunction dramatically outweighs the harm to the moving party from declining to enter one, the Court should decline to award preliminary relief.

Here, however, an injunction against Savage Tavern's use of the Mark on apparel imposes virtually no costs on Savage Tavern, while it would protect Signature Stag's sole revenue stream—clothing sales.  Any items in Savage Tavern's possession would remain in its possession—though, for all intents and purposes, impounded—until this case is finally resolved.  And it could always design its own mark to sell on hats and shirts in the meantime.

On the other hand, an injunction completely foreclosing Savage Tavern from using the Mark until a final determination on the merits can be reached might force it to incur unrecoverable costs, while a final decision might ultimately permit it to continue using the Mark.  Although Savage Tavern has presented no evidence as to what those costs would be or the extent of the modifications an injunction would necessitate, the Court is nevertheless sensitive to the reality that a preliminary injunction against the use of the Mark related to services is different than an injunction against the sale of goods bearing the Mark.

Even considering the changes Savage Tavern may be forced to make should its use of the Mark be enjoined in full, the balance of the equities remains in Signature Stag's favor.  Consider the incentives that would flow from a decision giving decisive, or even great, weight to the compliance costs an injunction would impose on an infringer.  An infringing user would be encouraged to infringe *a lot*—to put the Mark on every cup, plate, fork, knife,

window, table, t-shirt, it could find, to print it on the floors and to stamp it into the very bricks that compose the building.  Then, a Court would be forced to weigh the costs of replacing all of those items—essentially, the costs of building the business anew—against the *potential* harm to the goodwill of the Mark's owner.  That balance would likely, and rightly, tip in the infringer's favor.  But that gets the incentives exactly wrong:  Trademark law and its enforcement should incentivize parties to clarify their rights in a mark *before* substantial investments are made.  That Savage Tavern has elected to stake its reputation to someone else's trademark is regrettable, but it is a problem Savage Tavern was best positioned to avoid.  Even today, Savage Tavern is capable of pursuing a license to use the Mark from Signature Stag; it is best positioned to decide whether it is cheaper for it to comply with the Court's injunction or pay Signature Stag's price, thus rendering the injunction unnecessary.

Another factor that weighs heavily in the Court's consideration of the equities is the procedural posture of this case.  Many trademark cases involve claims of unclean hands, but this case is special.  Savage Tavern is the junior user, yet it sued Signature Stag.  And, based on the evidence before the Court, Savage Tavern may very well have stolen the Mark and made misrepresentations to the PTO in its registration application.  The undisputed evidence so far paints a picture of a brazen misappropriation of Signature Stag's trademark.  Savage Tavern represented to the PTO that it first used the Mark in July 2017, one month before Signature Stag's Lubbock location opened and almost a year before Savage Tavern served its first customer.  That timing seems awfully convenient.  Moreover, Savage Tavern waited for nearly two years after it opened to file its registration application.  *See* Dkt. No. 14 at 4 ("Filed 01-29-2020").  Based on the undisputed evidence before the Court, that

application was made *after* Fuller (who signed it) knew that Signature Stag used the same logo.  The Federal Circuit "has cautioned that there is 'no excuse for even approaching the well-known trademark of a competitor.'"  *Bridgestone Americas Tire Operations, LLC v. Fed. Corp.*, 673 F.3d 1330, 1337 (Fed. Cir. 2012) (quoting  *Kenner Parker Toys, Inc. v. Rose Art Indus., Inc.*, 963 F.2d 350, 353 (Fed. Cir. 1992)).  But that is what Savage Tavern did here.

Finally, the overriding goal of an injunction in a case of trademark infringement is to wind the clock back to the last peaceable state of affairs in the case—that is, the last date before the junior user began using the mark.  McCarthy § 30:50.  Here, that date is July 26, 2017, the day before Savage Tavern's alleged first use of the Mark.  Although Savage Tavern "will suffer some amount of harm if a preliminary injunction is issued, courts usually hold that when defendants improperly use a plaintiff's trademark, the threatened harm to the plaintiff outweighs the threatened harm to the defendants."  *Ramada Franchise Sys., Inc. v. Jacobcart, Inc.*, 3:01-CV-306-D, 2001 WL 540213, at *3 (N.D. Tex. May 17, 2001) (Fizwater, J.) (citation omitted).  For Signature Stag, the burden of losing control of its mark, the loss of customers, and the harm to its reputation and goodwill are far greater than the cost to Savage Tavern, "who [has] failed to identify any cost to [it] not created by [its] own likely infringing activities."  *Fletcher's Original State Fair Corny Dogs, LLC v. Fletcher-Warner Holdings LLC*, 434 F. Supp. 3d 473, 497 (E.D. Tex. 2020).

In sum, the balance of the equities weighs clearly in Signature Stag's favor, even if Savage Tavern is required to expend resources altering its décor or advertising.  It brought those costs on itself, and it remains capable of avoiding them by seeking a license from Signature Stag.

###### D.   An injunction is in the public interest, but only because Signature Stag is likely to prevail on the merits.

Finally, any preliminary injunction must be in the public interest.  Courts will often discuss whether an injunction protects consumers from deception or whether it will impede the free market.  Without a way to tell similar products apart, consumers cannot discriminate against the inferior version.  "The essence of competition is the ability of competing products to obtain public recognition based on their own individual merit." *Standard Oil Co. (Ky.) v. Humble Oil & Refining Co.*, 363 F.2d 945, 954 (5th Cir. 1966).  At the same time, restraining a competitor obviously constrains the market, yielding fewer options and lower quality.

In general, then, discussions of the public interest are unhelpful in the trademark-injunction context, as they are little more than proxies for the strength of the moving party's case.  If the allegedly infringing party is competing lawfully, the public interest favors competition for all the well-understood reasons—lower prices, higher quality, greater innovation.  If, on the other hand, the infringing party is violating another's trademarks, the public interest favors preventing deception and confusion because "[t]he public interest is always served by requiring compliance with Congressional statutes such as the Lanham Act and by enjoining the use of infringing marks."  *T-Mobile US, Inc. v. AIO Wireless LLC*, 991 F. Supp. 2d 888, 929 (S.D. Tex. 2014) (Rosenthal, J).

But it is tautological to say that fair competition is in the public interest and unfair competition is not in the public interest.  Because "the public interest cannot be determined independently from the substance of the dispute," this factor "is not entitled to much separate weight in the evaluation of the balance of harms between the parties."  *Waldmann Lighting Co. v. Halogen Lighting Sys., Inc.*, No. 91-C-3491, 1993 WL 243388, at *5 (N.D. Ill.

July 1, 1993).  So while Signature Stag has a strong case that it is the senior user of the mark and that Savage Tavern's use is likely to cause confusion, thus putting this factor in favor of an injunction, the Court gives this factor little weight in its final calculus.

**E.    None of Savage Tavern's counterarguments succeeds.**

Savage Tavern brings three primary arguments in response to Signature Stag's motion.  None responds on the merits, and all fail of their own accord.

**i.       Section 1125(c)(6) is irrelevant.**

The first—and core—argument that Savage Tavern offers against Signature Stag's motion is that such a motion is barred by 15 U.S.C. § 1125(c)(6).  That provision reads:

> **Ownership of valid registration a complete bar to action**
>
> The ownership by a person of a valid registration under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register under this chapter shall be a complete bar to an action against that person, with respect to that mark, that—
>> (A) is brought by another person under the common law or a statute of a State; and
>> (B)
>>> (i) seeks to prevent dilution by blurring or dilution by tarnishment; or
>>> (ii) asserts any claim of actual or likely damage or harm to the distinctiveness or reputation of a mark, label, or form of advertisement.

According to Savage Tavern, because it owns a "valid registration" and because Signature Stag brings a claim for dilution under the "common law or a statute of a State," Signature Stag's motion must be denied with prejudice "as a matter of long-established statutory and common law precedent."  Dkt. No. 13 at 4–6, 10.  Indeed, according to Savage Tavern, "Defendant's Motion _must_ be dismissed with prejudice as a matter of black letter law."  *Id.* at 6 (emphasis in original).  What is more, "there is no argument, no precedent, no statute,

and no evidence which Defendant can conceivably provide to this Court which either counters or negates 15 U.S.C. § 1125(c)(6)(A)-(B) under the Act." *Id.*

The record, evidence, and law prove otherwise. First, Signature Stag brings multiple claims, including one for unfair competition under both state and federal law, so any bar to a state-dilution claim is irrelevant when considering Signature Stag's likelihood of success on its unfair-competition claims. Dkt. No. 5 at 6–7.

Second, and relatedly, Signature Stag's motion, Dkt. No. 9, is brought under the Lanham Act, *id.* at 1 (citing 15 U.S.C. § 1125), rather than "under the common law or a statute of a State," so Section 1125(c)(6) is irrelevant by its own terms.

Third, even if the Court were to read Signature Stag's motion and its use of "dilution" (*see* Dkt. No. 10 at 8) such that Section 1125(c)(6) became relevant, it still would not bar Signature Stag's counterclaims or its motion because that provision depends upon "a valid registration." As explained below, Savage Tavern put almost all of its energy into arguing that, because it has a registered trademark, Signature Stag cannot bring a dilution claim under Texas law. Dkt. No. 13 at 4–6. That begs the question, though: Section 1125(c)(6) turns on "[t]he ownership by a person of a *valid* registration." (emphasis added). Signature Stag's key contention in this case is that Savage Tavern, in essence, stole the Mark and lied to the PTO about it. Unsurprisingly, then, it brings a counterclaim asking the Court to invalidate Savage Tavern's registration. As explained above, Signature Stag is very likely to succeed in proving that Savage Tavern is engaged in unfair competition. That conclusion flows from the probability that consumers will confuse the origins of Signature Stag's products. As it turns out, the tests for likelihood of confusion for trademark infringement and for cancellation are the same. *B & B Hardware Inc., v. Hargis Indus., Inc.*,

575 U.S. 138, 154–55 (2015). Thus, Signature Stag's likelihood of success as to its

Section 1125(a) unfair competition claim correlates to a likelihood of success that Savage

Tavern's registration should be cancelled under Section 1119. And given that courts have

uniformly concluded that the mere existence of a counterclaim for cancellation renders

Section 1125(c)(6) inapplicable,[10] Signature Stag's counterclaim for cancellation, *see* Dkt.

No. 5 at 9, makes Savage Tavern's focus on Section 1125(c)(6) misguided.

### ii.        Ownership is determined by use, not registration.

Savage Tavern says that, because "the only USPTO trademark ownership before this

Court is that of Plaintiff, demonstrated by Plaintiff's USPTO Certificate of Registered

Trademark," "the benefit of the injunctive relief provided by the Act belongs solely to

Plaintiff—*not* Defendant." Dkt. No. 13 at 7.

But, again, "[o]wnership of trademarks is established by use, not by registration."

*Union Nat. Bank of Texas, Laredo, Tex. v. Union Nat. Bank of Texas, Austin, Tex.*, 909 F.2d 839,

842 (5th Cir. 1990). "The first one to use a mark is generally held to be the 'senior' user and

is entitled to enjoin other 'junior' users from using the mark, or one that is deceptively

---

[10] *E.g.*, *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 635 n.4 (9th Cir. 2008) ("Jada's claim that its HOT RIGZ registration acts as a bar to Mattel's state law claim is misplaced because Mattel's eighth counterclaim is for cancellation of the HOT RIGZ registration under 15 U.S.C. § 1064. As such, if Mattel can succeed in obtaining that cancellation, the bar to state unfair competition actions found in 15 U.S.C. § 1125(c)(6) will be inapplicable."); *Jet, Inc. v. Sewage Aeration Sys.*, 165 F.3d 419, 424 (6th Cir. 1999) ("Jet has sought to add a count for cancellation of SAS's federal trademark registration. If Jet were successful on that claim, SAS would lose its affirmative defense."); *Viacom Inc. v. Ingram Enters., Inc.*, 141 F.3d 886, 891 n.8 (8th Cir. 1998) (holding that, although Section 1125(c)(6) "provides a 'complete bar' to state law dilution claims, Viacom could block this defense, for example, by establishing that Ingram does not own a 'valid registration.'"); *Mott's LLP v. Comercializadora Eloro, S.A.*, 507 F. Supp. 3d 780, 786 (W.D. Tex. 2020) (Ezra, J.); *see also Buc-ee's Ltd. v. Panjwani*, No. 4:15-CV-3704, 2017 WL 4221461, at *2–*4 (S.D. Tex. Sept. 21, 2017) (Ellison, J.); *Under Armour, Inc. v. Body Armor Nutrition, LLC*, No. 12-1283, 2013 WL 5375444, at *5 (D. Md. Aug. 23, 2013); *V.V.V. & Sons Edible Oils Ltd. v. Meenakshi Overseas LLC*, No. 2:14-CV-296, 2016 WL 1268008, at *11 (E.D. Cal. Mar. 31, 2016); *Lovetap, LLC v. CVS Health Corp.*, No. 1:16-CV-3530-TWT, 2017 WL 3250374, at *4 (N.D. Ga. July 31, 2017).

similar to it."  *Id.* at 842–43.  And "[t]he nonregistered rights of a senior user continue and are not erased by the later federal registration of a junior user."  McCarthy § 16:18.50; 15 U.S.C. § 1115(a) (establishing that registration "shall not preclude another person from proving any legal or equitable defense or defect . . . which might have been asserted if such mark had not been registered"); *accord Dallas Cowboys Football Club, Ltd. v. America's Team Props., Inc.*, 616 F. Supp. 2d 622, 633 (N.D. Tex. 2009) (Kinkeade, J.); *Tinker, Inc. v. Poteet*, 3:14-CV-2878, 2017 WL 4351304, *5–6 (N.D. Tex. Sept. 30, 2017) (Lindsay, J).  Savage Tavern did not exist—let alone start using the Mark in commerce—until after Signature Stag sold goods bearing the mark, so any presumptions Savage Tavern might enjoy by dint of its moribund registration are irrelevant.

### iii.    Future Effects

In an unsupported paragraph, Savage Tavern predicts that the sky will fall if Signature Stag's motion is granted:

> [I]f this Court were to heed Defendant's request and grant a preliminary injunction against Plaintiff it would have disastrous effects as a matter of public policy, by rendering the LANHAM ACT [sic] toothless and completely nullifying the difficult, important, and expensive process to obtain a USPTO Certificate of Registration.  Such a precedent would undoubtedly lead to irreparable harm not only to Plaintiff, but also to any similarly situated legal owner of a trademark within this Honorable Court's jurisdiction, as case after case may be brought by surreptitious infringers against registered trademark holders; and, such precedent would fly in the face of 15 U.S.C. § 1125 et seq., and all related federal statutes and supporting common law precedent established within the last 80 years.  Thus, to grant Defendant the preliminary injunction it seeks now would be to unabashedly strike a new and dangerous tangent, alarmingly perpendicular to that which has been steadily and consistently established by Congress and the Judiciary over the last century.

Dkt. No. 13 at 9.

The Court disagrees.  Protecting Signature Stag's investment advances the Lanham Act's twin aims for all the reasons explained above.  The Court would "strike a new and dangerous tangent" if it refused to enter an injunction solely because a junior user recently registered the mark.  As for the burdens of registration:  it costs $250 to file for registration, 37 C.F.R. § 2.6(a)(1)(iv), and Savage Tavern's application process was relatively brief—it filed its initial application in January 2020, then filed a supplemental photograph of the Mark's use on a menu in April, *see* TSDR Dkt. Nos. 1–3; 7–8.  Granting Signature Stag's motion not only protects Signature Stag's investment, but sends a message to other would-be infringers, too.

*            *            *

In sum, Signature Stag is substantially likely to succeed on the merits of its infringement claim.  The Lanham Act strongly favors issuing a preliminary injunction against future infringement.  Moreover, Signature Stag's unrealized sales and the harm to its reputation are incapable of calculation, rendering them irreparable.  While Savage Tavern may be forced to incur costs—it has presented no evidence to that effect—it is very likely that it will be forced to incur those costs after a final judgment, and it is certain that the costs to Signature Stag should an injunction not issue will be higher.  And none of Savage Tavern's arguments against the issuance of an injunction persuades.  Indeed, Savage Tavern's brief does not even address the merits of Signature Stag's motion: there is no discussion of the digits of confusion, irreparable harm, the balancing of the equities, or the public interest.  Nevertheless, the Court has independently considered the factors weighing against Signature Stag's motion.  But the Court concludes that even its own best efforts

cannot counterbalance the evidence and law on Signature Stag's side.  Accordingly, a preliminary injunction barring Savage Tavern's continued use of the Mark is warranted.

### 4.  Scope of Relief

"As with injunctive relief generally, an equitable remedy for trademark infringement should be no broader than necessary to prevent the deception."  *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 620 (5th Cir. 2013).  Here, the Court concludes that a total injunction is necessary to prevent harm to Signature Stag's reputation.  "The confusion that is remedied by trademark and unfair competition law is confusion not only as to source, but also as to affiliation, connection or sponsorship."  McCarthy § 23:8.  Given the evidence as to confusion, the relatively small market for the goods and services offered by each, and the use of the Mark by both sides in advertising, only a total injunction will protect Signature Stag's interest in exclusive use of the Mark and freedom from unwanted affiliation.  Further underscoring the need for a total injunction is the nature of Signature Stag's use of the Mark:  If the Court allowed Savage Tavern to continue to use the Mark, wearers of Signature Stag clothing would become walking advertisements for Savage Tavern, an establishment with which they may have zero affiliation.  Savage Tavern is therefore enjoined from any and all uses of the Mark, including but not limited to selling apparel featuring the Mark, using menus featuring the Mark, and from advertising using the Mark, either passively or actively, including the maintenance of past advertisements or equivalent communications.

In its demand letter, Savage Tavern demanded that Signature Stag comply within five days.  Dkt. No. 1 at 15.  The Court doubts the reasonableness of that demand, so the Court will double it.  The Court will not sanction noncompliance with this Order until ten

days after it is issued.  After that, any noncompliance will result in sanctions commensurate with the scope and flagrancy of the violation.

**5.      Conclusion**

Having sown the wind, Savage Tavern now reaps the whirlwind.  Signature Stag's motion for a preliminary injunction (Dkt. No. 9) is granted, and Savage Tavern is enjoined from any and all use of the Mark pending a final disposition of this case.

So ordered on March 8, 2022.

JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE